# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

NORMAN PETERS,
    *Defendant*.

No. 3:18-cr-188 (VAB)

## RULING ON MOTION TO SUPPRESS

On December 14, 2018, Norman Peters ("Defendant") moved to suppress evidence of cocaine seized during a motor vehicle stop by police officers from the Stamford Police Department on April 1, 2016. Defendant's Motion to Suppress, dated Dec. 14, 2018 ("Suppression Mot."), ECF No. 43. Mr. Peters challenges both the validity of the stop and the reasonableness of the search subsequently undertaken, which resulted in finding the cocaine.

On January 16, 2019, the Government filed its opposition to Mr. Peters's suppression motion. Government's Opposition to Suppression Mot., dated Jan. 16, 2019 ("Gov't Opp."), ECF No. 57.

On January 24, 2019, the Court conducted an evidentiary hearing and held argument on the motion. Minute Entry, dated Jan. 24, 2019, ECF No. 60.

For the following reasons, the motion to suppress is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Findings of Fact[1]

This case is part of a larger investigation and prosecution into a drug trafficking conspiracy allegedly operated by Bobby Gutierrez, coordinated by the Drug Enforcement

---

[1] The Court makes the following findings, unless expressly stated otherwise.

Administration ("DEA"), in partnership with state and local law enforcement agencies—including the Stamford Police Department. *See* Notice of Related Case, dated Sept. 6, 2018, ECF No. 10. That investigation resulted in the prosecution of nine defendants, including Mr. Gutierrez, who pleaded guilty to two counts before this Court on November 21, 2016 and was sentenced to 160 months imprisonment on May 8, 2017. *See United States v. Gutierrez*, No. 16-cr-114 (VAB), ECF Nos. 145, 308.

DEA agents intercepted wire and electronic communications by Mr. Gutierrez under Title III warrants approved by United States District Judge Stefan R. Underhill on March 10, 2016 and March 16, 2016.[2]

On April 1, 2016, law enforcement officers involved in the wiretap investigation intercepted a phone call to Mr. Gutierrez's cell phone from the number (646) 887-5350, made by a person who identified himself as "Ski."

"Ski", a known alias for Mr. Peters, had used this telephone number before. Mr. Peters had become known to the law enforcement officers as someone involved in drug trafficking, as he had previously been convicted for sale of narcotics.

The monitored call led the officers to believe that Mr. Peters was arranging a drug sale:

| | |
|---|---|
| GUTIERREZ: | Hello? |
| PETERS: | Yo? |
| GUTIERREZ: | Yo? |
| PETERS: | This is Ski. What up? |
| GUTIERREZ: | What up? Oh, oh okay, I know. What's going on with you? |
| PETERS: | Ain't shit. You around? |
| GUTIERREZ: | Yeah, what's good? |
| PETERS: | Shit, I'm about to be out there in, like, but I'm almost out there. But I'm about to go eat first. So like 45 minutes. |

---

[2] Title III refers to Title III of the Omnibus Crime Control of Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22, as amended by the Electronic Communications Privacy Act, commonly known as the Wiretap Act.

GUTIERREZ:     Alright, what exit you going to be on?
PETERS:          Uh, 14.
GUTIERREZ:     Alright.
PETERS:          Alright.

Transcript of Call No. 467, admitted as Gov't Ex. 1. From this conversation, the officers

understood that a drug sale was likely to occur. DEA Special Agent Ryan McHugh testified that

the reference to the exit number, 14, related to the amount of cocaine being purchased: fourteen

grams of cocaine.

About forty-five minutes later, "Ski" called Mr. Gutierrez again:

GUTIERREZ:     Hold up, Michael! Hold up!
                      [Pause]
GUTIERREZ:     Hello!
PETERS:          Yo!
GUTIERREZ:     What up?
PETERS:          Shit! Where you want me to come?
GUTIERREZ:     Shit. I'll be by my job in a couple of minutes.
                      Like 10, 15 minutes.
PETERS:          Alright. [Voices overlap]
GUTIERREZ:     15, 20 minutes, 15, 20 minutes, really.
PETERS:          Alright, I'm already out here. So I'll wait for
                      you.
GUTIERREZ:     Alright.

Transcript of Call No. 473, admitted as Gov't Ex. 1. Agent McHugh testified that at this point,

the officers believed Mr. Peters would be meeting Mr. Gutierrez at B&B Deli, located at 988

State Street in Bridgeport, Connecticut—which they had already identified through previous

intercepts as a location where Mr. Gutierrez would meet with traffickers.

Agent McHugh then testified that he contacted several police departments to see if they

had units available and ultimately dispatched Stamford Police Officer Jose Alvarez, who was

part of the investigative team, to conduct surveillance on 988 State Street.

Agent McHugh also testified that the investigative team conducted a motor vehicle

records check to discover whether Mr. Peters had a valid driver's license. He described this as a

routine investigative technique used to identify whether local law enforcement could have reasonable suspicion to stop a vehicle unrelated to the Title III investigation. By doing this, local law enforcement would be able to stop the vehicle and provide an explanation for the stop that would not jeopardize the ongoing Title III investigation.

Agent McHugh testified that the search revealed Mr. Peters did not possess a valid driver's license. As a result, Agent McHugh and his team decided that they would use this information as a basis to stop the vehicle that they could communicate with Mr. Peters, with the hope that they could verify that Mr. Gutierrez was distributing cocaine without jeopardizing the ongoing Title III investigation.

Officer Alvarez arrived at 988 State Street in an unmarked car and began conducting surveillance. He soon saw a gray 2008 Toyota Avalon with Connecticut license plate 692-YHN pull into the parking lot of the store. He testified that he was not close enough, however, to identify whether Mr. Peters was the driver.

Agent McHugh recalls that Officer Alvarez called out the license plate number to the investigative team through his Nextel device, which allowed him to communicate with other investigative team members.[3] A motor vehicle records search indicated that the car was registered to a woman other team members identified as a relative of Mr. Peters.

---

[3] Agent McHugh, Officer Alvarez, and Stamford Police Officer Brendan Phillips all testified that the investigative team—which all of them were members of—communicated through Nextel phones or radios that use a walkie-talkie style of communication that allows for near-instantaneous communication among groups, even when they are spread over a wide geographical area. *See also Garner v. Lee*, 908 F.3d 845, 850–51 (2d Cir. 2018) (describing testimony that victim "was in 'pretty much constant contact' with [accused drug dealer] through the walkie-talkie function on [victim's] Nextel phone"). These devices are frequently used by police investigative teams. *See, e.g.*, *United States v. Wright*, No. 4:09-cr-193ERW(MLM), 2009 WL 2913898, at *3 (E.D. Mo. June 29, 2009) ("The officers were all in contact with Dets. Willenbrink and Davis by means of their 'direct connect' Nextel phones which can function like a 'walkie-talkie.'); *United States v. Lopez*, No. 3:07-cr-60 (SRU), 2007 WL 2696595, at *3 (D. Conn. Sept. 12, 2007) ("Bobnick testified that, for the entire time that the law enforcement agents were at the Ansonia address, including the time when Bobnick asked for and received Repollet's consent, the law enforcement agents could communicate with each other both by raising their voices and through the 'walkie-talkie' feature of their Nextel cell phones.")

Officer Alvarez testified that, a few minutes later, he saw Mr. Gutierrez drive his car into the parking lot. Mr. Gutierrez briefly went into the deli at 988 State Street before leaving and getting into the gray Toyota. The car then left the parking lot with Mr. Gutierrez, drove 200 yards down the street and parked. About a minute later, Mr. Gutierrez got out of the car, and the car pulled away.

Officer Alvarez followed the car onto I-95 South and alerted other officers on his team of what he witnessed at 988 State Street. According to Agent McHugh, the team decided not to conduct the stop in Bridgeport so as to protect the investigation, but instead directed Officer Alvarez to continue following him back to Stamford. At some point during the drive, Officer Alvarez was close enough to the car to see that the driver was Mr. Peters. Officer Alvarez recalled that he reported this to the central wire room and that Stamford Police Sergeant O'Brien[4]—another member of the investigative team—helped coordinate the stop.

According to Officer Alvarez, Sergeant O'Brien coordinated the stop and directed Stamford Police Officer Luis Velez to be at Exit 9, in case Mr. Peters exited there.

Officer Velez was not a member of the investigative team. Unlike Officer Alvarez, he was driving a marked patrol vehicle, and had no knowledge of the investigation. Officer Velez testified that he received instructions from the narcotics unit of the Stamford Police Department, provided a description of the car, the plate number, informed that the driver did not possess a valid license, and directed to be in position to stop the vehicle if it exited at Exit 9.

When Officer Alvarez saw Mr. Peters getting off at Exit 9, he called Officer Velez and instructed him to be ready to stop the vehicle.

---

[4] A first name for Sergeant O'Brien was not provided during the suppression hearing and is not in evidence.

Mr. Peters got off I-95 at Exit 9 in Stamford. Officer Velez followed the car a short distance after it left the highway. Officer Velez then stopped the car in front of 38 Home Court in Stamford, Connecticut, a relatively secluded area with little traffic. Officer Alvarez remained on the scene and observed the interactions that followed.

As he approached the car, Officer Velez observed Mr. Peters making furtive movements with his arms toward his legs. When he approached the driver's window, Officer Velez saw a plastic bag with a green leafy substance between Mr. Peters's legs that he believed to be marijuana. At that point, Officer Velez contacted Officer William Garay for additional assistance. After Officer Garay arrived, Officer Velez directed Mr. Peters to get out of the car. Mr. Peters admitted to Officer Velez that the substance was marijuana, and Officer Velez then placed him into his patrol car—without handcuffs. Officer Velez also retrieved Mr. Peters's learner's permit,[5] registration, and insurance from the car.

Officer Velez then asked for a K-9 unit to be dispatched to the location, and soon Sergeant Phelan arrived with Cronin, a K-9 dog trained to identify narcotics by smell. The dog's response indicated the presence of illegal drugs in the console, but none were found there. Officer Velez then approached Peters and asked if he had anything illegal on him. When Mr. Peters denied this, Sergeant Phelan had Cronin sniff Mr. Peters. Cronin detected and alerted the officers to the presence of narcotics near Mr. Peters's groin area. Mr. Peters denied that he had any drugs hidden near his groin area.

---

[5] In Connecticut, a learner's permit does not permit the holder to drive alone. They must have a driver older than 20 who has been licensed for at least four years in the vehicle with them, or a person who holds an instructor's license. *See* CONN. GEN. STAT. § 14-36(b) ("An adult instruction permit shall entitle the holder, while such holder has the permit in his or her immediate possession, to operate a motor vehicle on the public highways, provided such holder is under the instruction of, and accompanied by, a person who holds an instructor's license issued under the provisions of section 14-73 or a person twenty years of age or older who has been licensed to operate, for at least four years preceding the instruction, a motor vehicle of the same class as the motor vehicle being operated and who has not had his or her motor vehicle operator's license suspended by the commissioner during the four-year period preceding the instruction.")

By this time, another Stamford Police Officer, Brendan Phillips, had arrived on the scene to provide additional assistance with the search. Then-Officer Phillips (he is now a Sergeant), like Officer Alvarez, had been working with the DEA task force and knew, from hearing information relayed through his Nextel device from other team members, about the likely drug transaction that had occurred between Mr. Peters and Mr. Gutierrez back in Bridgeport, and about the planned stop. He was also aware of Mr. Peters through previous narcotics investigations in Stamford.

Because of all this knowledge, Officer Phillips determined he should conduct a further search of Mr. Peters for the drugs. He testified to being concerned that, if not found at the time of the search, Mr. Peters might dispose of or attempt to destroy the drugs—or be harmed by its location on his body. He instructed Mr. Peters to keep his hands on the trunk, to take one step back from the vehicle so he could not press the front of his waistband against the car, and to spread his feet. He then began patting down Mr. Peters outside of his clothing. As he moved toward Mr. Peters's legs, he felt Mr. Peters's lower body tense up; specifically, the muscles in his thighs, hamstrings, and buttocks became tight, and Mr. Peters began to push the front of his waistband towards the car as if he was clenching his legs together.

Officer Phillips, from his training and experience, felt these behaviors indicated that Mr. Peters was trying to hide something within his buttocks. He continued the search by  asking Mr. Peters to squat down—a position which he figured would make it more difficult to maintain the same muscle tension and hold onto anything in his buttocks. After he did this and searched again, using a "bladed hand" to continue the search of his groin and buttocks area, Officer Phillips felt an object inside Mr. Peter's pants, between the top of his buttocks. Officer Phillips then reached

into Mr. Peters's pants and grabbed the cocaine, which was packaged and wrapped in napkins. He was not wearing gloves when he reached into Mr. Peters's pants.

In his declaration in support of his motion to suppress, Mr. Peters described this search differently, as extremely invasive—and violent:

> An officer then searched me for a third time, this time placing his hand down the back of my pants, in my buttocks area, while I was standing with him on a public street in view of the public and hotel guests. While the officers' hand was in my pants, he used my underwear as a glove or barrier and felt around in between my buttocks. He presented me with a plastic bag and then lifted me by my underwear and slammed me on the trunk of the police car while handcuffed. I couldn't even brace myself. I know I was handcuffed at the time that he searched my buttocks area inside my pants because I remember that I could not protect my face when he slammed me on the trunk of the car.

Declaration of Norman Peters, dated annexed as Ex. C to Suppression Mot., ¶ 13.[6]

The police arrested Mr. Peters, and charged him with possession of narcotics and possession with intent to sell narcotics in violation of Conn. Gen. Stat. §§ 21a-278a and 21a-279 (both of which are state-level felony charges), possession of marijuana in violation of Conn. Gen. Stat. § 21a-279a (a non-criminal state-level offense), and operating a motor vehicle without a license in violation of Conn. Gen. Stat. § 14-36a (under state law, a civil infraction for a first offense, and a class D misdemeanor for a second offense). Gov't Opp. at 6. Later the same evening, Mr. Peters was released on bond *Id.*

Following his release, Mr. Peters called Mr. Gutierrez at 7:56 p.m. and told him about the stop, search, and arrest—and wondered if he had been the subject of an undercover operation. The DEA task force intercepted this call as well:

PETERS:      Yo!
GUTIERREZ:   What up?

---

[6] The Court relies on Mr. Peter's declaration because he did not testify at the suppression hearing.

PETERS:     Man, as soon I got to town I got bagged, man.

GUTIERREZ:  Are you serious, baby boy?

PETERS:     Word man! As soon as . . . like I don't know . . . the soon . . . I feel like they followed me or something.

GUTIERREZ:  You think so?

PETERS:     I can't really call it. Like, soon as I got to the exit off the highway, I'm at the light and I see a cop coming from the other direction and he like weaving through cars trying to, trying to get you know, to the front of the line. So I see this but like I'm getting off the highway. I don't even think nothing of that. I go around the corner, I go around the corner, I [stammers] come like behind, back off the Xtra Mart, once I got off on exit 9. I pull over, as soon as I pull over, [the cop]* ran up on me. And as he run up on me a blue Beamer creeped with a Spanish [cop]* in there. He pulled up to the end of the street and walk back to me and he's a narc. I never even seen him before in Stamford. He was in blue, like a 328.

GUTIERREZ:  Blue 328?

PETERS:     And then I seen another car, they was parked to the end of the street. They wouldn't pull up but they was watching. They was in a gold Honda Accord with black tint. I know that was the peoples. Now, I don't know if I should . . . [voices overlap] Go ahead.

GUTIERREZ:  You ain't called nobody? You ain't talk to nobody?

PETERS:     Nothing. Nothing. I didn't even had nothing waiting for me, like nothing. I was just doing that to be ahead of the game for tonight, like . . .

GUTIERREZ:  [Coughs] That's kind of crazy yo!

PETERS:     The only thing I could think of, did I walk into somebody shit? You know being that is the motor inn, and they could of already been setting somebody up and I, and I stumble in that area. But then on the . . . the only thing that's kind of question to me is how the cop was already moving as I'm getting off the highway, and when I asked the cop, I'm like "Yo, why did you pull me over." You know this after he arrested me, I'm like "Yo, why made you initially stop me?" and he was like, "They just told me to pull

|  | you over." He said, "They don't have light and sirens in they cars." So when he saId that I'm like . . . for him to be rushing when I saw him, that mean he already got the call to come pull somebody over. |
| GUTIERREZ: | Yeah. |
| PETERS: | And the only way he could had got the call at that point is if they was already following me, cause I had literally, just . . . I'm at the light off the exit, as I see him trying to get through the light. |
| GUTIERREZ: | Yeah, yeah. I see what you saying. |
| PETERS: | I don't know. I mean, I'll know more when I speak to my lawyer and get the report but, wanted to give you heads up and shit. It looked a little odd, a little crazy. |

Transcript of Call No. 499, Gov't Ex. 1.[7]

Subsequent laboratory analysis determined that the white powdery substance was cocaine, with a net weight of 14.012 grams, an amount consistent with the Government's interpretation of Mr. Peters' coded conversation with Mr. Gutierrez. *Id.*

**B.    Procedural Background**

On September 5, 2018, a grand jury indicted Mr. Peters for: (1) possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (2) use of a telephone to facilitate a drug trafficking felony, in violation of 21 U.S.C. § 841(a)(1). Indictment, dated Sept. 5, 2018, ECF No. 1.

On September 6, 2018, Mr. Peters appeared before Magistrate Judge Sarah A. L. Merriam for his arraignment. Minute Entry, dated Sept. 6, 2018, ECF No. 6. After pleading not guilty to both counts, Mr. Peters was detained at the Donald W. Wyatt Detention Center in Central Falls, Rhode Island.

---

[7] Square brackets ("[ ]") without asterisks indicate notations in the original transcript. Square brackets followed by an asterisk ("[ ]*") indicate the Court's alterations.

On October 10, 2018, Mr. Peters sought release from custody on bond, pending trial, with his sister, Nicole Beckham, serving as a third-party custodian. Motion for Bond Hearing, dated Oct. 10, 2018, ECF No. 13. The Court referred the motion to Judge Merriam.

On October 24, 2018, Judge Merriam held a bond hearing and granted the motion for bond over the opposition of the Government and U.S. Probation. Judge Merriam imposed, however, an additional condition of home detention in Ms. Beckham's residence, to mitigate what she identified as a danger to the community in Mr. Peters's driving record. Transcript of Hearing, dated Oct. 24, 2018, ECF No. 42, at 4:18–5:2 ("[T]he only way, given Mr. Peters' record, which suggests that every time he is given the opportunity he drives a car without a license and potentially under the influence of various substances,  possesses drugs and/or weapons, would be to release him to a lockdown sort of situation, whether that's at home or a facility."); *id.* at 25:7–12 ("I do think that on a very, very short leash . . . that I can reasonably assure the safety of the community if you are to reside with your sister."). Judge Merriam also set a $50,000 appearance bond and an additional set of standard release conditions, including GPS location monitoring. *See* Appearance Bond, dated Oct. 24, 2018, ECF No. 17; Order Setting Conditions of Release, dated Oct. 24, 2018, ECF No. 18.

The same day, counsel for Mr. Peters moved to continue jury selection and for an in-court scheduling conference to address scheduling issues. Motion to Continue, dated Oct. 24, 2018, ECF No. 21. On October 30, 2018 the Court granted the motion and continued jury selection and trial to December 3, 2018, to allow counsel for Mr. Peters reasonable time necessary for effective preparation for trial, and excluded the intervening period from the Speedy Trial clock. Order, dated Oct. 30, 2018, ECF No. 22.

On November 5, 2018, Mr. Peters moved to modify his conditions of release so he could vote in the November 6, 2018 general election. Motion to Modify Conditions of Release to Permit Voting, dated Nov. 5, 2018, ECF No. 26. The Court granted the motion. Order, dated Nov. 5, 2018, ECF No. 27.

On November 13, 2018, Mr. Peters moved for permission to travel to attend the funeral of his great aunt in Charleston, South Carolina, or in the alternative for his third-party custodian to be permitted to travel to the funeral. Motion to Travel, dated Nov. 13, 2018, ECF No. 28. The Court denied the motion as to Mr. Peters, but granted his third-party custodian, Ms. Beckham, permission to travel for four days, while requiring Mr. Peters to remain at Ms. Beckham's apartment on location monitoring and home incarceration during that time. Order, dated Nov. 14, 2018, ECF No. 29; Corrected Order, dated Nov. 14, 2018, ECF No. 31.

On November 19, 2018, the Court held a scheduling conference, during which Mr. Peters stated his objection to a further continuance or delay of the jury selection and trial in his case. Minute Entry, dated Nov. 19, 2018, ECF No. 35. The Court made findings on the record and concluded that "the failure to grant a continuance would deny counsel for Mr. Peters the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence, particularly in light of the significant amount of discovery in this case and the potential for filing of a motion to suppress." Order, dated Nov. 21, 2018 ("Nov. 21 Order"), ECF No. 38. Accordingly, the Court held that the ends of justice would be "served by continuing jury selection and trial, outweighing the best interests of the public and Mr. Peters in a speedy trial," continued the jury selection to February 4, 2019, and excluded the intervening time from the Speedy Trial clock. *Id.*

On November 30, 2018, Mr. Peters moved to modify the conditions of release in several ways, including to remove the home incarceration condition. Motion to Modify Conditions of Release, dated Nov. 30, 2018, ECF No. 40. The Court held a hearing on that motion on December 19, 2018, but ultimately declined to remove the home incarceration condition. *See* Order, dated Dec. 21, 2018, ECF No. 46. The Court did, however, grant Mr. Peters's request to amend the conditions of release to allow Mr. Peters to travel to New Haven to meet with his attorney to ensure he could adequately prepare for trial. *Id.*

On December 14, 2018, Mr. Peters moved to suppress evidence, i.e., the cocaine seized during the April 1, 2016 traffic stop. *See* Mot.; Memorandum in Support of Mot., dated Dec. 14, 2018, ECF No. 43-1.

On January 16, 2019, the Government opposed Mr. Peters's motion to suppress. Gov't Opp.

On January 24, 2019, the Court held an evidentiary hearing and held argument on the motion to suppress. Minute Entry, dated Jan. 24, 2019, ECF No. 60. A total of four witnesses testified and seven exhibits were admitted into evidence.

The Court reserved decision.

Jury selection is scheduled to begin on February 4, 2019, with trial to begin on February 19, 2019.

## II.     STANDARD OF REVIEW

Illegally obtained evidence is generally not admissible at a criminal trial under the exclusionary rule. *See, e.g., United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation omitted) (in the context of a Fourth Amendment violation); *United States v. Anderson*, 929 F.2d 96, 98–99, 102 (2d Cir. 1991) (in the context of the voluntariness of a confession under the Fifth

Amendment); *see also Terry v. Ohio*, 392 U.S. 1, 12–13 (1968) (noting that the exclusionary rule maintains "judicial integrity" and "has been recognized as a principal mode of discouraging lawless police conduct") (citations omitted).

Exclusion of evidence is not automatic, however; it is considered a "last resort, not [a] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Mich.*, 547 U.S. 586, 591 (2006)); *see also id.* ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies"). A court will suppress evidence only when the "remedial objectives" of the exclusionary rule "are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs . . . ." *Hudson*, 547 U.S. at 591.

## III. DISCUSSION

### A. Motor Vehicle Stop

Mr. Peters argues that Officer Velez did not have probable cause or a reasonable suspicion to stop his vehicle, and that any evidence flowing from that stop must therefore be excluded. The Court disagrees.

"The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role" in the analysis." *Id.* (citing *Whren*, 517 U.S. at 813). Any

evidence seized as a result of an illegal stop may be suppressed under the "fruit of the poisonous tree" doctrine. *Scopo*, 19 F.3d at 781 (citation and internal quotation marks omitted).

Both probable cause and reasonable suspicion are assessed based on the "totality of the circumstances." *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("[W]e conclude that it is wiser to abandon the 'two-pronged test' established by our decisions in *Aguilar* and *Spinelli*. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations . . . . We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires . . . . ") (citations omitted); *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) ("Like probable cause, reasonable suspicion is determined based on the totality of the circumstances . . . .").

"Probable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" *Scopo*, 19 F.3d at 781 (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077 (1988)). This means that officers must believe that, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found[.]" *Illinois v. Gates*, 462 U.S. at 238.

The "reasonable suspicion" standard, however, is lower, because "'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Elmore*, 482 F.3d at 179 (quoting *Arvizu*, 534 U.S. at 273–74). Reasonable suspicion still "requires more than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* at 178 (quoting *Alabama v. White*, 496 U.S. 325, 178 (2007)). "Police 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty

interest].'" *Id.* at 178–79 (quoting *Terry*, 392 U.S. at 21); *see also Arvizu*, 534 U.S. at 273 ("the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'") (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

In the context of a traffic stop, to have probable cause, officers must observe "objective circumstances" that indicate a traffic law violation has occurred. *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1999) (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)); *see also United States v. Harrell*, 268 F.3d 141, 148–49 (2d Cir. 2001) (finding that probable cause existed to stop a car where an "objectively reasonable" police officer would have suspected the windows were tinted in violation of a traffic law).

To have reasonable suspicion in the context of a traffic stop, "the detaining officer must have a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 274; *U.S. v. Stewart*, 551 F.3d 187, 192 (2d Cir. 2009) ("[T]raffic stops are reasonable when they arise from the reasonable suspicion of a traffic violation.") (citing *Whren*, 517 U.S. at 810).

Here, police had two independent grounds for stopping Mr. Peters.

First, they had a reasonable suspicion of a traffic violation—driving without a license— based both on their previous research into Mr. Peters's motor vehicle record and their direct observation of him driving the car. That research—which the investigative team conducted after they heard the second conversation between Mr. Peters and Mr. Gutierrez—as well as Officer Alvarez's firsthand observations, provided them with a sufficiently particularized and objective basis for suspecting that Mr. Peters was operating the vehicle without a driver's license. Under Second Circuit law, whether or not the traffic violation was pretextual "is irrelevant," *Paige-El v. Herbert*, 735 F. App'x 753, 756 (2d Cir. 2018), as "the actual motivations of the individual

officers involved in the stop play no role in the analysis," *Holeman*, 425 F.3d at 190 (internal quotation marks and citations omitted).

The reasonable suspicion of this traffic violation thus provided the police with a constitutionally appropriate basis to stop the vehicle.

Second, the police had a reasonable suspicion that Mr. Peters had engaged in illegal drug activity.

The Supreme Court has been clear that officers may draw on "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981). Here, the officers evaluated the evidence before them—both the wiretapped call and the observed interactions in Bridgeport between Mr. Gutierrez and Mr. Peters. Applying their experience and training, they developed a reasonable suspicion that a narcotics transaction had just occurred. They followed and stopped Mr. Peters as a result.

Mr. Peters argues that the stop was improper because Mr. Peters was not "committing a traffic violation that was readily observable by Officer Velez." Def.'s Mem. at 8. Under the "collective knowledge" doctrine, however, whether Officer Velez had developed a reasonable suspicion based on what he observed is of no moment. Under this doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v.*

*Hensley*, 469 U.S. 221, 230–33 (1985); *United States v. Canieso*, 470 F.2d 1224, 1230 n.7 (2d Cir. 1972).

While an officer cannot simply rely on the collective knowledge of "the department" generally, it is well-settled that it is reasonable to impute specific knowledge to the searching or arresting officer where "the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect." *Colon*, 250 F.3d at 135–36 (citations omitted).

In other words, if Officer Velez could "trac[e] the information back to any person with the training to make a determination of reasonable suspicion[;]" then collective knowledge can be imputed to Officer Velez. *Id.* at 135. Here, Officer Velez acted on the information provided to him regarding Mr. Peters' inability to drive a car by himself. This was more than a sufficient basis to make the stop.

Mr. Peters also argues that the stop lacked probable cause or reasonable suspicion because it was based on an uncorroborated informant's tip. As described above, however, the informant in this case was another law enforcement official who had observed the drug transaction between Mr. Gutierrez and Mr. Peters.

Thus, either the traffic violation or the drug activity provided the police with the reasonable suspicion necessary to stop his car. The stop therefore was lawful.

B.  **Reasonableness of the Search**

Mr. Peters also argues that, even if the stop was lawful, the search of his groin area and buttocks was an unreasonable warrantless search. The Court disagrees.

Mr. Peters argues that, to the extent the stop was a lawful traffic stop, it only authorized a limited-scope stop for a short amount of time. He further argues that the "search incident to arrest" exception cannot justify the extensive warrantless search of Mr. Peters's person, which he argues occurred too long after his initial detention. Def.'s Mem. at 14–15 ("At the time that they searched Mr. Peters, he had been in custody for nearly an hour, he had been personally searched multiple times, and a canine unit was used to intrusively sniff his groin and buttocks. At this point, there was no exigency that justified the officer shoving his hands inside of Mr. Peters['s] underwear, in between his butt cheeks, and searching his private areas for narcotics.").

As an initial matter, the Court notes that the evidence at the suppression hearing does not support Mr. Peters's account of the length of the stop. In fact, the entire encounter took approximately forty-five minutes, according to Officer Velez's testimony and the timestamps generated in the Department's incident report. Incident Detail Report, admitted as Gov't Ex. 2. Even under this limited theory of the lawfulness of the stop, however, the police lawfully could conduct the search, given the additional evidence quickly uncovered during the stop—even independent of the "search incident to arrest" exception. *See United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts.") (citation omitted).

When Officer Velez approached the car, he saw Mr. Peters make furtive movements toward his legs. He then saw a plastic bag with a green leafy substance on Mr. Peters's lap, in plain view, which Mr. Peters admitted was marijuana. This evidence gave Officer Velez probable cause to search the vehicle, at the very least.

When the K-9 dog alerted officers that additional drugs were present, the dog's alert also provided the officers with sufficient probable cause to search the car more extensively, as well as Mr. Peters's person. *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.").

In addition, Officer Phillips, who conducted the search, had knowledge from his participation with the DEA task force of the considerable likelihood that Mr. Peters had drugs on his person.

Finally, Mr. Peters argues that the extensive and intrusive nature of the search in his pants violated his privacy rights, either because it was a strip search or otherwise invaded Mr. Peters' privacy because it was not conducted in a more reasonable manner, i.e. in an isolated area or at the police station. Def.'s Mem. at 10–15. The Court disagrees.

The Stamford Police Department did not conduct a strip search of Mr. Peters, under its own standards. The Department's strip search policy defines a strip search as "having an **<u>arrested</u>** person remove or arrange some or all of his or her clothing or, if an arrested person refuses to remove or arrange his or her clothing, having a peace officer or employee of the police department remove or arrange the clothing of the arrested person so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments used to clothe said anatomical parts of the body." Stamford Police Department, Policy No. 1309, effective Aug. 12, 2013, admitted as Def.'s Ex. D. This definition quotes almost verbatim from the relevant

Connecticut statute. *See* CONN. GEN. STAT. § 54-33k ("For the purposes of this section and section 54-33*l*, 'strip search' means having an arrested person remove or arrange some or all of his or her clothing or, if an arrested person refuses to remove or arrange his or her clothing, having a peace officer or employee of the police department remove or arrange the clothing of the arrested person so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments used to clothe said anatomical parts of the body."). Officer Phillips never asked Mr. Peters to remove or arrange some or all of his clothing so as to permit any visual inspection of his private anatomical areas or the garments used to clothe them.

In fact, the search technique he used—asking Mr. Peters to squat down so he could not maintain the same muscle tension in his buttocks—made it unnecessary to conduct a strip search. Officer Phillips was able to feel an object inside Mr. Peter's pants, between the top of his buttocks. Officer Phillips then reached in and grabbed the cocaine without conducting a visual inspection. Because Mr. Peters did not testify this unrebutted testimony serves as the Court's account of what happened.

The Court therefore finds that this was not a strip search but instead, as the Government has argued, a "reach-in" search. *See United States v. Williams*, 477 F.3d 974, 977 (8th Cir. 2007) ("[A] reach-in search of a clothed suspect does not display a suspect's genitals to onlookers, and it may be permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy.") (citations omitted); *Meeks v. City of Minneapolis*, 822 F. Supp. 2d 919, 923 (D. Minn. 2011) ("A public strip search of a suspect is more invasive than a "reach-in" search performed when an officer reaches into a suspect's pants without disrobing him to retrieve a hidden item from the area surrounding the suspect's buttocks or genitals.") (citing *Williams*, 477 F.3d at 976, 977).

Second, the search of Mr. Peters, undertaken around 38 Home Court in Stamford, did not need to occur elsewhere. The testimony of Officer Phillips explained that the search was necessary to obtain the drugs before they could be disposed or perhaps harmful to Mr. Peters, based on his experience. This was not an unreasonable assumption for Sergeant Phillips to make. *Williams*, 477 F.3d at 976 ("While the potential for destruction of evidence is diminished when a suspect is in custody, it is not completely eliminated, and it was not unreasonable for the officers to assume the initiative by seizing the contraband that Williams secreted in his underwear, rather than allow Williams to disrobe and remove the drugs himself.").

Moreover, the police conducted the search in a relatively secluded area and the search, while intrusive, was very brief. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.") (collecting cases); *Williams*, 477 F.3d at 976–77 ("We conclude that MPD officers took adequate precautions to protect Williams's privacy, and that the search in the parking lot caused no unreasonable 'invasion of personal rights' in violation of the Fourth Amendment . . . . We believe that the officers took sufficient precautions to protect Williams's privacy before fulfilling their legitimate need to seize contraband that Williams had chosen to carry in his underwear.") (citing *Bell*, 441 U.S. at 559).

While Mr. Peters has argued that there was the Stamford Motor Lodge nearby and many people could have observed the search, there was no testimony at the hearing that anyone actually did observe the search. *See Williams*, 477 F.3d at 977 ("The district court's findings of

fact recounted uncontradicted testimony of police officer Randy Olson that no vehicles entered the lot during the search, and that he saw no person other than police officers—either inside or outside the parking lot—within eyesight of the brief search."). In any event, the stop and search lasted forty-five minutes, from the time of the stop to the time the police took Mr. Peters away in a patrol car.  Given these circumstances, and the considerable likelihood of drugs on Mr. Peters' person based on the electronic and visual surveillance of Mr. Peters, it was reasonable to conduct this search then and there and not someplace else.

Because both the stop and the search of Mr. Peters was lawful, Mr. Peter's motion to suppress the cocaine found on his person therefore will be denied.

## IV.    CONCLUSION

For the reasons discussed above, the motion to suppress is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of January, 2018.

    /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE