**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA

v.

NORMAN PETERS,
*Defendant.*

No. 3:18-cr-24 (VAB)

## RULING ON POST-TRIAL MOTIONS

After a two-day trial, a jury found Norman Peters guilty of possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1) and (b)(1)(C) and use of a telephone to facilitate a drug trafficking felony under 21 U.S.C. § 841(a)(1). Jury Verdict, ECF No. 90.

Following the verdict, Mr. Peters moved for a judgment of acquittal, alleging insufficient evidence of his intent to distribute cocaine. Memorandum of Law in Support of Judgment of Acquittal and for New Trial, ECF No. 116. Alternatively, Mr. Peters moves for a new trial, alleging that the jury wrongfully convicted him. *Id.*

For the following reasons, the Court **DENIES** Mr. Peters's motions for judgment of acquittal and for a new trial.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  DEA Investigation

This case evolved from a larger Drug Enforcement Administration ("DEA") investigation of Bobby Gutierrez for allegedly operating a drug trafficking conspiracy. Notice of Related Case, ECF No. 10; *see also United States v. Gutierrez*, No. 16-cr-114 (VAB), ECF Nos. 145, 308.

DEA agents intercepted wire and electronic communications involving Mr. Gutierrez

under Title III warrants approved by United States District Judge Stefan R. Underhill.[1]

**B.     Mr. Peters's Arrest**

On April 1, 2016, law enforcement officers intercepted a phone call to Mr. Gutierrez's cell phone from the number (646) 887-5350, made by a person identified as "Ski," later determined to be Mr. Peters:

| | |
|---|---|
| GUTIERREZ: | Hello? |
| PETERS: | Yo? |
| GUTIERREZ: | Yo? |
| PETERS: | This is Ski. What up? |
| GUTIERREZ: | What up? Oh, oh okay, I know. What's going on with you? |
| PETERS: | Ain't shit. You around? |
| GUTIERREZ: | Yeah, what's good? |
| PETERS: | Shit, I'm about to be out there in, like, but I'm almost out there. But I'm about to go eat first. So like 45 minutes. |
| GUTIERREZ: | Alright, what exit you going to be on? |
| PETERS: | Uh, 14. |
| GUTIERREZ: | Alright. |
| PETERS: | Alright. |

Transcript of Call No. 467, Gov't Ex. 1.

From this call, the officers believed that Mr. Peters was arranging a drug sale. DEA Special Agent Ryan McHugh testified that Exit 14 related to the amount of cocaine Mr. Peters intended to purchase: fourteen grams of cocaine. Suppression Hearing Transcript, ECF No. 74, at 23:22–24:6.

About forty-five minutes later, "Ski" called Mr. Gutierrez again:

| | |
|---|---|
| GUTIERREZ: | Hold up, Michael! Hold up! |
| | [Pause] |
| GUTIERREZ: | Hello! |
| PETERS: | Yo! |
| GUTIERREZ: | What up? |

---

[1] Title III refers to Title III of the Omnibus Crime Control of Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22, as amended by the Electronic Communications Privacy Act, commonly known as the Wiretap Act.

| PETERS: | Shit! Where you want me to come? |
| GUTIERREZ: | Shit. I'll be by my job in a couple of minutes. Like 10, 15 minutes. |
| PETERS: | Alright. [Voices overlap] |
| GUTIERREZ: | 15, 20 minutes, 15, 20 minutes, really. |
| PETERS: | Alright, I'm already out here. So I'll wait for you. |
| GUTIERREZ: | Alright. |

Transcript of April 1, 2016 Call No. 473, Gov't Ex. 3-T.

At that point, Agent McHugh testified that officers believed Mr. Peters would be meeting Mr. Gutierrez at B&B Deli, located at 988 State Street in Bridgeport, Connecticut, which is the location previously intercepted phone calls indicated Mr. Gutierrez met distributors for illegal drug sales. Suppression Hearing Transcript, ECF No. 74, at 28:6–10.

Agent McHugh then testified that he contacted several police departments to see if they had police units available, and Stamford Police sent Officer Jose Alvarez to conduct surveillance on 988 State Street. *Id.* at 29:1–19.

Agent McHugh also testified that the investigative team conducted a motor vehicle records check to discover whether Mr. Peters had a valid driver's license, a routine investigative technique used to identify whether local law enforcement could have reasonable suspicion to stop a vehicle unrelated to the Title III investigation. *Id.* at 29:20–30:24. The officers learned that Mr. Peters did not have a valid driver's license. *Id.* The police officers could then stop the vehicle lawfully without jeopardizing the larger DEA investigation. *Id.* at 30:25–31:25.

Officer Alvarez arrived at 988 State Street in an unmarked car and in plain clothes to conduct surveillance. *Id.* at 45:2–16. A gray 2008 Toyota Avalon with Connecticut license plate 692-YHN pulled into the parking lot of the store. *Id.* at 32:10–20; 54:23–25. From his vantage point, he could not see if Mr. Peters was the driver. *Id.* at 58:6–10.

Agent McHugh recalls that Officer Alvarez identified the license plate number for the

investigative team through his Nextel device, which allowed him to communicate with other investigative team members.[2] A motor vehicle records search indicated that the car was registered to a woman identified as a relative of Mr. Peters. Suppression Hearing Transcript, ECF No. 74, at 38:23–39:4.

Officer Alvarez testified that, a few minutes later, Mr. Gutierrez drove into the parking lot. Mr. Gutierrez briefly went into the store at 988 State Street, before leaving and getting into the gray Toyota. 65:23–66:11. The car then left the parking lot with Mr. Gutierrez, drove two hundred yards down the street and parked. *Id.* Mr. Gutierrez then got out of the car, and the car pulled away. *Id.* at 66:12–16. Officers later identified Mr. Peters as the driver of the gray Toyota. *Id.* at 67:19–68:10.

Officer Alvarez followed the car onto I-95 South and informed the other officers on the investigative team of what he had observed at 988 State Street. *Id.* at 71:10. According to Agent McHugh, the team decided not to conduct the stop in Bridgeport to protect the broader drug trafficking investigation, but instead directed Officer Alvarez to continue following him back to Stamford. *Id.* at 71:1–3. At some point during the drive, Officer Alvarez was close enough to the car to identify Mr. Peters as the driver. *Id.* at 80:24–81:5. Officer Alvarez recalled that he

---

[2] Agent McHugh, Officer Alvarez, and Stamford Police Officer Brendan Phillips all testified that the investigative team—of which all were members—communicated through Nextel phones or radios that use a walkie-talkie style of communication that allows for near-instantaneous communication among groups, even when they are spread over a wide geographical area. *See also Garner v. Lee*, 908 F.3d 845, 850–51 (2d Cir. 2018) (describing testimony that victim "was in 'pretty much constant contact' with [accused drug dealer] through the walkie-talkie function on [victim's] Nextel phone"). These devices are frequently used by police investigative teams. *See, e.g., United States v. Wright*, No. 4:09-cr-193ERW(MLM), 2009 WL 2913898, at *3 (E.D. Mo. June 29, 2009) ("The officers were all in contact with Dets. Willenbrink and Davis by means of their 'direct connect' Nextel phones which can function like a 'walkie-talkie.'); *United States v. Lopez*, No. 3:07-cr-60 (SRU), 2007 WL 2696595, at *3 (D. Conn. Sept. 12, 2007) ("Bobnick testified that, for the entire time that the law enforcement agents were at the Ansonia address, including the time when Bobnick asked for and received Repollet's consent, the law enforcement agents could communicate with each other both by raising their voices and through the 'walkie-talkie' feature of their Nextel cell phones.").

reported this to the central wire room and that Stamford Police Sergeant O'Brien[3]—another member of the investigative team—helped coordinate the vehicle stop. *Id.* at 83:22–84:5.

According to Officer Alvarez, Sergeant O'Brien coordinated the stop, and directed Stamford Police Officer Luis Velez to be at Exit 9, if Mr. Peters got off I-95 at that exit. *Id.* at 84:16–19.

Unlike Officer Alvarez, Officer Velez was driving a marked patrol vehicle and had no knowledge of the investigation. *Id.* at 125:20–126:3. Officer Velez testified that the narcotics unit of the Stamford Police Department told him the description of the car, the plate number, and that the driver did not possess a valid license, and then directed him to be in position to stop the vehicle, if it got off the freeway at Exit 9. *Id.* at 125:23–125:19.

Officer Velez followed the car a short distance after it left the highway before stopping the car in front of 38 Home Court in Stamford, Connecticut, a relatively secluded area with little traffic. 126:13–24.

As he approached the car on the driver's side, Officer Velez observed Mr. Peters making movements to hide something between his legs. *Id.* at 127:4–13. When he approached the driver's window, Officer Velez saw a plastic bag with a green leafy substance between Mr. Peters's legs, what Officer Velez believed to be marijuana.127:14–22. At that point, Officer Velez contacted Officer William Garay for additional assistance. *Id.* at 127:23–25. After Officer Garay arrived, Officer Velez directed Mr. Peters to get out of the car. 128:3–7. Mr. Peters admitted to Officer Velez that the substance was marijuana. 128:14–18. Officer Velez also retrieved Mr. Peters's learner's permit,[4] registration, and insurance from the car. 128:19–129:11.

---

[3] Officer Alvarez did not provide a first name for Sergeant O'Brien during the suppression hearing and thus, his first name is not in evidence.

[4] In Connecticut, a learner's permit does not permit the holder to drive alone. They must have a driver older than 20 who has been licensed for at least four years in the vehicle with them, or a person who holds an instructor's license.

Officer Velez then requested a K-9 unit at the location; a few minutes later, Sergeant Phelan arrived with Cronin, a dog trained to identify drugs by its scent. Cronin signaled in such a way as to suggest the presence of illegal drugs in the car's console, but the officers found no narcotics. *Id.* at 129:23–130:22. Officer Velez then approached Peters and asked if he had anything illegal on him. *Id.* at 130:23–131:3. When Mr. Peters denied this, Sergeant Phelan had Cronin sniff Mr. Peters. Cronin detected and alerted the officers to the presence of narcotics near Mr. Peters's groin area. *Id.* at 131:4–7. Mr. Peters denied that he had any drugs hidden near his groin area. *Id.* at 131:8–12.

By this time, another Stamford Police Officer, Brendan Phillips, had arrived on the scene to provide additional assistance with the search. 131:13–21. Then-Officer Phillips, like Officer Alvarez, had been working with the DEA task force and knew about a potential drug transaction that had occurred between Mr. Peters and Mr. Gutierrez in Bridgeport, about the planned stop, and Mr. Peters's identity through a previous narcotics investigations. *Id.* at 165:11–169:24.

As a result, Officer Phillips determined that he should conduct a further search of Mr. Peters for the drugs. *Id.* at 171:5–16; 173:17–23. He instructed Mr. Peters to keep his hands on the trunk, and to take one step back from the vehicle, and to spread his feet. *Id.* at 174:3–8. He then patted down the outside of Mr. Peters's clothing. *Id.* at 174:12–17. As he moved toward Mr. Peters's legs, he felt Mr. Peters's lower body tense up; specifically, the muscles in his thighs, hamstrings, and buttocks, and Mr. Peters began to push the front of his waistband towards the car, as if he was clenching his legs together. *Id.* at 174:18–24.

---

*See* CONN. GEN. STAT. § 14-36(b) ("An adult instruction permit shall entitle the holder, while such holder has the permit in his or her immediate possession, to operate a motor vehicle on the public highways, provided such holder is under the instruction of, and accompanied by, a person who holds an instructor's license issued under the provisions of section 14-73 or a person twenty years of age or older who has been licensed to operate, for at least four years preceding the instruction, a motor vehicle of the same class as the motor vehicle being operated and who has not had his or her motor vehicle operator's license suspended by the commissioner during the four-year period preceding the instruction.").

From his training and experience, Officer Phillips believed Mr. Peters was trying to hide something within his buttocks. *Id.* at 174:25–175:6. In Officer Phillip's experience, it was difficult for parties to maintain a clench after squatting, which reveals items individuals attempt to hide. *Id.* at 175:18–176:7. He continued the search by asking Mr. Peters to squat down and searching again with a "bladed hand" to continue the search of his groin and buttocks area. *Id.* at 175:7–17. During this search, Officer Phillips felt an object inside Mr. Peter's pants, between the top of his buttocks. *Id.* at 176:8–11. Officer Phillips then reached into Mr. Peters's pants and grabbed the suspected cocaine, which was wrapped in napkins. *Id.* at 176:18–177:16.

The police arrested Mr. Peters, and charged him with possession of narcotics and possession with intent to sell narcotics in violation of Conn. Gen. Stat. §§ 21a-278a and 21a-279, possession of marijuana in violation of Conn. Gen. Stat. § 21a-279a, and operating a motor vehicle without a license in violation of Conn. Gen. Stat. § 14-36a. Gov't Opp. at 6. Later that evening, Mr. Peters posted bond *Id.*

### C.     Post-Arrest Communication

Following his release, Mr. Peters called Mr. Gutierrez at 7:56 p.m. and told him about the stop, search, and arrest, and speculated that he may have been the subject of an undercover operation. The DEA task force also intercepted this call:

| | |
|---|---|
| PETERS: | Yo! |
| GUTIERREZ: | What up? |
| PETERS: | Man, as soon I got to town I got bagged, man. |
| GUTIERREZ: | Are you serious, baby boy? |
| PETERS: | Word man! As soon as . . . like I don't know . . . the soon . . . I feel like they followed me or something. |
| GUTIERREZ: | You think so? |
| PETERS: | I can't really call it. Like, soon as I got to the exit off the highway, I'm at the light and I see a cop coming from the other direction and he like weaving through cars trying to, trying to get you |

know, to the front of the line. So I see this but like I'm getting off the highway. I don't even think nothing of that. I go around the corner, I go around the corner, I [stammers] come like behind, back off the Xtra Mart, once I got off on exit 9. I pull over, as soon as I pull over, [the cop] * ran up on me. And as he run up on me a blue Beamer creeped with a Spanish [cop]* in there. He pulled up to the end of the street and walk back to me and he's a narc. I never even seen him before in Stamford. He was in blue, like a 328.

GUTIERREZ: Blue 328?

PETERS: And then I seen another car, they was parked to the end of the street. They wouldn't pull up but they was watching. They was in a gold Honda Accord with black tint. I know that was the peoples. Now, I don't know if I should . . . [voices overlap] Go ahead.

GUTIERREZ: You ain't called nobody? You ain't talk to nobody?

PETERS: Nothing. Nothing. I didn't even had nothing waiting for me, like nothing. I was just doing that to be ahead of the game for tonight, like . . .

GUTIERREZ: [Coughs] That's kind of crazy yo!

PETERS: The only thing I could think of, did I walk into somebody shit? You know being that is the motor inn, and they could of already been setting somebody up and I, and I stumble in that area. But then on the . . . the only thing that's kind of question to me is how the cop was already moving as I'm getting off the highway, and when I asked the cop, I'm like "Yo, why did you pull me over." You know this after he arrested me, I'm like "Yo, why made you initially stop me?" and he was like, "They just told me to pull you over." He said, "They don't have light and sirens in they cars." So when he said that I'm like . . . for him to be rushing when I saw him, that mean he already got the call to come pull somebody over.

GUTIERREZ: Yeah.

PETERS: And the only way he could had got the call at that point is if they was already following me, cause I had literally, just . . . I'm at the light off the exit, as I see him trying to get through the

<div style="text-align: right; margin-left: 2in;">

light.

GUTIERREZ:    Yeah, yeah. I see what you saying.

PETERS:    I don't know. I mean, I'll know more when I speak to my lawyer and get the report but, wanted to give you heads up and shit. It looked a little odd, a little crazy.
</div>

Transcript of April 1, 2016 Call No. 499, Gov't Ex. 8-T.

### D.    Pre-Trial Actions

On December 14, 2018, Mr. Peters moved to suppress the cocaine seized during the motor vehicle stop by the Stamford Police Department, challenging both the validity of the stop and the reasonableness of the search that discovered cocaine. Defendant's Motion to Suppress, ECF No. 43.

On January 16, 2019, the United States of America ("Government") filed a memorandum in opposition to Mr. Peters's suppression motion. Memorandum in Opposition to Motion to Suppress, ECF No. 57.

On January 22, 2019, Mr. Peters filed a reply to the Government's opposition motion. Reply to Response, ECF No. 59.

On January 24, 2019, the Court conducted an evidentiary hearing on Mr. Peters's motion. Minute Entry, ECF No. 60.

On January 29, 2019, the Court denied Mr. Peters's suppression motion. Ruling on Motion to Suppress, ECF No. 65.

On February 4, 2019, the Court conducted jury selection for Mr. Peters's criminal trial, and the trial began shortly thereafter. Minute Entry, ECF No.72.

### E.    The Trial

In addition to testimony from Agent McHugh and Officer Velez, the Government called two expert witnesses.

On February 20, 2019, Ada Kong, a Senior Forensic Chemist for the DEA, testified at the trial. February 20, 2019 Trial Transcript, ECF No. 111, at 288:22–289:1. As a forensic chemist, Ms. Kong analyzes evidence for the presence of controlled substances, testing more than 3,000 samples. *Id.* at 289:25–290:10.

On August 23, 2018, Ms. Kong analyzed the package from Mr. Peters's arrest. *Id.* at 305:8–14. After receiving the package from Mr. Peters's arrest, Ms. Kong performed three tests to identify the substance, which was about fourteen grams of cocaine hydrochloride. *Id.* at 300:11–301:21. Other than cocaine, the sample contained phenyl-tetrahydro and imidazothiazole. *Id.* at 301:22–302:14. Ms. Kong concluded that the package contained 14.012 grams of cocaine hydrochloride. *Id.* at 304:14–20.

On February 20, 2019, DEA Agent Raymond Walczyk testified about his experience working for the Organized Crime Drug Enforcement Task force. Over the course of his career, Agent Walczyk has worked as a border patrol agent and for the DEA. *Id.* at 342:5–16; 343:3–17. His experience includes over 1,000 drug investigations involving heroin, fentanyl, cocaine base, MDMA, and marijuana, where he has worked as an undercover agent, surveillance agent, or an affiant for affidavits. *Id.* at 343:25–345:1. As an undercover agent, he has posed as drug consumers and lower-level drug dealers during investigations. *Id.* at 345:2–14.

Agent Walczyk's training and experience knowledge of the manner and means of cocaine distribution and he has testified as an expert in federal court on at least five previous occasions. *Id.* at 347:1–14. Based on Agent Walczyk's training and experience, individuals use code to conceal illegal drug transactions. 349:17–350:14. Agent Walczyk also testified that pre-paid phones "are very commonly used by drug traffickers because it is a cell phone for which fees are paid upfront, that it eliminates the need for providing very specific personal information for a

service contract." *Id.* at 350:20–351:2. Agent Walczyk testified that he often comes across pre-paid phones. *Id.* at 351:8–10.

Based on his investigative experience, Agent Walczyk testified that Connecticut is a consumption state for cocaine, where wholesalers deal in multiple kilograms, mid-level dealers deal between 100 grams to a kilogram, and then street-level dealers deal quantities from 3.5 grams to 100 grams. *Id.* at 351:24–353:23.

When asked about the levels of distribution, Agent Walczyk testified that a "street-level dealer will package cocaine into retail units for sale on the streets to cocaine consumers or drug consumers." *Id.* at 354:4–6. And quantities broken down into street sales "[o]n the lower end of the spectrum there are what's commonly referred to as dimes, or dime bags, a "dime" being a reference to the bag containing a tenth of a gram of cocaine and selling on the street for $10. Dubs are also common, which are two-tenths of a gram, and they sell for $20. And 50s are somewhat common. That's a half a gram for $50." *Id.* at 354:21–355:2. Agent Walczyk testified that the most common selling amounts were one-tenth of a gram or two-tenths of a gram. *Id.* at 355:3–8.

As an undercover officer, Agent Walczyk testified that the most cocaine he purchased at one time was a $50 bag, but that increments of a tenth of a gram were the most common sold to users. *Id.* at 355:14–23. He also testified that purchasing a greater amount "would raise suspicion if I was asking for a greater quantity" because "[d] rug consumers generally don't stockpile drugs;" rather, "[t]hey purchase what they're going to use immediately or in the very near future." *Id.* at 355:24–356:7.

Agent Walczyk then testified that user quantities are usually packaged "[i]n the -- in very small ZipLoc-style bags." *Id.* at 356:19–21.

Agent Walczyk estimated that fourteen grams of cocaine "would make 140 dime bags or 70 dubs." *Id.* at 356:25–357:4.

On cross-examination, Agent Walczyk conceded that he did not know or have any personal experience with Mr. Peters, and had no knowledge of whether he purchased or used wholesale quantities of cocaine. *Id.* at 360:1–24. But Agent Walczyk testified that based on his experience with and knowledge from other investigations, he had an idea as to how much cocaine a user would go through in one week. *Id.* at 361:14–19.

Agent Walczyk also testified that it would be unlikely for a heavy user to limit use to one-tenth of a gram. *Id.* at 362:13–16.

In his experience working on investigations, Agent Walczyk testified that users purchase from street-level dealers only what they can use immediately, but also that these users have limited resources and could make multiple purchases in a day. *Id.* at 362:17–363:12.

Agent Walczyk testified that fourteen grams would cost between $600 and $700. *Id.* at 363:19–13. And that it would be uncommon for someone to purchase this amount for personal use. *Id.* at 364:14–25. But Agent Walczyk testified that his experience was limited to speaking to and posing as low-level purchasers without a lot of money. *Id.* at 365:1–6.

Agent Walczyk noted that individuals pay less for bulk purchases and that a heavy drug user might buy in bulk, but he had not seen that behavior during his investigations. *Id.* at 365:7–366:1.

On re-direct, Agent Walczyk testified that, in his experience, 3.5 grams of cocaine was street-level redistribution quantity. *Id.* at 367:17–368:2.

On re-cross-examination, Agent Walczyk admitted that he could not know what is in a user's mind when they purchase drugs. *Id.* at 382:18–22 (stating "[n]o, I can't read their mind.").

When deciding about whether someone possessed cocaine for personal or distribution uses, Agent Walczyk testified that he looked for packaging materials to indicate packaging in smaller amounts or the purity of the drug. *Id.* at 383:3–10.

On re-direct, Agent Walczyk stated that drug records, scales, baggies would all function as indicia of distribution, which officers would recover while executing a search warrant of the drug dealer's residence. *Id.* at 386:3–21. But that sort of indicia would not be found in the vehicle used to transport narcotics. *Id.* at 386:22–387:3.

Agent Walczyk also noted that the absence of evidence of cash payments and customer records would not weigh in favor of distribution. *Id.* at 388:24–389:24.

After Agent Walczyk's testimony, the Government rested their case, and Mr. Peters rested as well.

## F.       Post-Trial Jury Instructions

After the presentation of evidence, the parties jointly agreed on jury instructions. The Court instructed jurors that the Government had the burden to prove the following essential elements beyond a reasonable doubt:

> <u>First</u>: that Norman Peters possessed a mixture or substance containing a detectable amount of cocaine;
> <u>Second</u>: that Mr. Peters knew he possessed cocaine; and
> <u>Third</u>: that Mr. Peters intended to distribute cocaine or did distribute cocaine. It is not necessary for you to be convinced that Mr. Peters actually delivered the cocaine to someone else, or that he made any money out of the transaction. It is enough for the Government to prove, beyond a reasonable doubt, that he had in his possession what he knew was cocaine and that he intended to transfer it, or some of it, to someone else.

Post-Trial Jury Instructions, ECF No. 89, at 23. Specific to the intent to distribute, "[t]he phrase 'distribute cocaine' means to deliver cocaine. 'Deliver' is defined as the actual, constructive or attempted transfer of cocaine. Simply stated, the words distribute and

deliver mean to pass on, or to hand over to another, or cause to pass on or hand over to another." *Id.* at 27.

To prove this element, the Government had to prove "beyond a reasonable doubt that the defendant had control over the cocaine with the state of mind or purpose to transfer it to another person or persons." *Id.* In addition to possession, the Government had to "prove beyond a reasonable doubt that Mr. Peters intended to distribute it to someone else." *Id.* But distribution did not require a sale of cocaine; rather, "distribution requires a concrete involvement in the transfer or intended transfer of cocaine." *Id.*

### G. Jury Verdict and Post-Trial Motions

On February 21, 2019, the jury found Norman Peters guilty of possession with intent to distribute under 21 U.S.C. § 841(a)(1) and (b)(1)(C) and use of a telephone to facilitate a drug trafficking felony under 21 U.S.C. § 841(a)(1). Jury Verdict, ECF No. 90.

That same day, Mr. Peters moved for acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33. Motion for Judgment of Acquittal, or, in the alternative, For a New Trial, ECF No. 85.

When moving under Rule 29, Mr. Peters argues that the Government's evidence of intent to distribute was insufficient. Memorandum of Law in Support of Defendant's Motions for Judgments of Acquittal and for a New Trial, ECF No. 116, at 3–14.

Alternatively, Mr. Peters argues that the Court should order a new trial under Rule 33 because the Government failed to meet its burden proving intent to distribute, and the jury wrongfully convicted Mr. Peters, an admitted cocaine user, of drug trafficking. *Id.* at 16–19.

In response, the Government argues that the evidence was sufficient for the jury to conclude that Mr. Peters possessed cocaine, with the intent to distribute it to others, and used a

telephone to facilitate that drug trafficking. *Id.* at 16–22. Moreover, the Government argues that the jury's inferences must control, the Court and jury must view the evidence in its entirety, and there was no evidence of personal use of cocaine. *Id.* at 23–30.

The Government also argues that there are no exceptional circumstances to warrant a new trial because Mr. Peters raises no new arguments, and the evidence was sufficient for a jury to find Mr. Peter's guilty of both counts. *Id.* at 31–32.

Mr. Peters responded that the Court need not draw all inferences in favor of the Defendant to make a finding of insufficient evidence. Reply Memorandum in Support of Defendant's Motions for Judgment of Acquittal and For a New Trial, ECF No. 123, at 2–6. Alternatively, Mr. Peters argues that the interest of justice requires a new trial. *Id.* at 6–7.

## II.   STANDARD OF REVIEW

### A.   Judgment of Acquittal

When reviewing a judgment of acquittal after a jury verdict, courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)) (alteration and internal quotation marks omitted). A defendant challenging the sufficiency of the evidence thus "bears a heavy burden." *United States v. Si Lu Tian,* 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks omitted).

### B.    Motion to Vacate and Grant a New Trial

Rule 33 allows the court to "grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. Under Rule 33, the trial court has "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In deciding such a motion, courts may weigh the evidence and the credibility of witnesses but cannot "wholly usurp" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000). Accordingly, the power to set aside a jury verdict "should be used 'sparingly' and only 'in the most extraordinary circumstances.'" *United States v. Zayac*, No. 3:09–cr–00136 (JCH), 2011 WL 5238823, at *2 (D. Conn. Nov. 1, 2011) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

The court also "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice." *Id.* To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

### A.    Judgment of Acquittal

When challenging a jury's verdict, "a defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citing *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). While "specious inferences are not indulged," *see United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008), courts "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences

that can be drawn from the evidence," *see United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006). "Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, but if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt," the conviction must stand. *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir. 1995) (internal citations omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Autuori*, 212 F.3d at 114 (quoting *Guadagna*, 183 F.3d at 129) (alterations omitted).

Mr. Peters argues that the Government never proved that Mr. Peters intended to distribute cocaine to others. Memorandum of Law in Support of Motions for Judgment of Acquittal and a New Trial, ECF No. 116 ("Mem. in Supp. of Post-Trial Mots."), at 4. Rather, Mr. Peters argues that the Government merely provided some testimony or evidence supporting and inference that the drugs were intended for distribution, which equally support a theory of innocence and does not prove Mr. Peters's guilt beyond a reasonable doubt. *Id.* at 6. Mr. Peters challenges the sufficiency of the Government's three key pieces of evidence to support the essential element that he intended to distribute cocaine.

First, Mr. Peters argues that the Government's expert had limited value in terms of determining Mr. Peters's intent. On cross-examination, Agent Walczyk admitted that he could not know what someone intended to do with drugs, unless there was other evidence to infer intent. *Id.* at 7. Mr. Peters then argues that there was no additional evidence introduced, aside from the cocaine quantity to support the inference of intent to distribute. *Id.* at 7–8. Because the Government did not introduce additional evidence, Mr. Peters argues that the Government could only rely on the number of individual doses yielded from fourteen grams of cocaine as evidence

of Mr. Peters's intent to distribute. *Id.* at 8. Mr. Peters also argues that Agent Walczyk could not rule out that the fourteen grams of cocaine seized from Mr. Peters could be consumed by a heavy cocaine user with the financial resources to purchase cocaine in greater quantities. *Id.* at 8–9. Mr. Peters therefore argues that Mr. Walczyk's testimony regarding low-income users could not rule out the possibility of a high-quantity user purchasing in bulk to save money. *Id.* at 9.

Second, Mr. Peters argues that telephone recordings that allude to Mr. Peters's plan to distribute cocaine are inconclusive. Although the Government argued that the calls between Mr. Peters and Mr. Gutierrez were evidence of two dealers communicating, Mr. Peters argues that it was not reasonable for a jury to conclude that Mr. Peters was a drug dealer because the Government offered no testimony to aid the jury in concluding his involvement in drug trafficking. *Id.* at 11–12. In the absence of such evidence, the jury would only be speculating that Mr. Peters was involved in drug selling, and not significant personal drug use—as he argues was always the purpose of the cocaine. *Id.* at 12. Because of the ambiguity of terms in the phone call, Mr. Peters argues that the Government cannot use the call as a basis for his involvement in drug trafficking. *Id.* at 12–13.

Third, Mr. Peters argues that his use of a pre-paid phone to contact Mr. Gutierrez does not support an inference that Mr. Peters engaged in drug trafficking. *Id.* at 13. Because Mr. Peters never changed phones, he argues that an inference that his use of a pre-paid phone signaled his involvement in drug trafficking required jury speculation. *Id.* at 14.

Due to the alleged limitations in the Government's case, Mr. Peters contends that a reasonable jury could not find that he was guilty of the distribution element beyond a reasonable doubt. *Id.*

In response, the Government argues that the evidence conclusively establishes that Mr.

Peters knowingly possessed cocaine, with the intent to distribute it, and used a telephone to facilitate that drug trafficking crime. Government's Memorandum in Opposition to the Defendant's Post-Trial Motions, ECF No. 120 ("Mem. in Opp. to Post-Trial Mots."), at 16. To support its position, the Government relies on four arguments.

First, the Government argues that the combination of the quantity of cocaine seized from Mr. Peters, the expert testimony from Special Agent Walczyk, use of a pre-paid telephone, and the sequence of calls between Peters and Gutierrez before and after his arrest form a sufficient basis for intent to distribute. *Id.* at 18. The Government contends that officers apprehended Mr. Peters with possession of fourteen grams of cocaine, and Agent Walczyk testified that was enough to furnish significant distribution-levels of cocaine. *Id.* Moreover, the Government believes Agent Walczyk's testimony on his experience both purchasing and distributing cocaine provided context for the quantity of drugs on Mr. Peters when the officers apprehended him. *Id.* at 18–19. While Agent Walczyk could not rule out Mr. Peters's defense theory, the Government argues that his expert testimony, coupled with the content of the phone calls Mr. Peters made before and after his arrest, indicate that he intended to distribute the cocaine. *Id.* at 19–21.

The Government also argues that a reasonable jury could infer from Mr. Peters post-arrest call to Mr. Gutierrez that he had not yet lined up specific customers but had formulated a plan to distribute cocaine. *Id.* at 21. Based on this call, the Government inferred that Mr. Peters did not seek replacement cocaine for personal use, did not express concern over the loss of the cocaine, or indicate that he depended on the substance. *Id.* at 21–22. Rather, Mr. Peters focused on the investigation, which indicated he was a drug dealer—not a drug user. *Id.* at 22. The Government asserts that the combination of distribution quantities of cocaine and communications indicating distribution were enough to meet its burden beyond a reasonable

doubt. *Id.* at 22–23.

Second, the Government contends that the jury's inferences must control. Because Rule 29 calls for the Court to consider the evidence in the light most favorable to the Government, the inferences drawn by the jury in reaching its guilty verdict should control. *Id.* at 23–24. For example, the Government argues that weighing the evidence related to any ambiguous elements of the post-arrest calls should rest with the jury. *Id.* at 24. Indeed, the Government argues that juries usually establish intent to distribute by inference, and the Court should leave resolution of those inferences to the jury. *Id.* at 24–25.

Third, the Government argues that the jury must consider the evidence collectively, and the weight of the evidence is in the Government's favor. According to the Government, Mr. Peters tries to disaggregate the evidence to minimize its collective weight. *Id.* at 26. During the trial, the Court charged the jury with considering all the evidence presented, which is also true for the Court's consideration of the Mr. Peters's Rule 29 motion. *Id.* at 27. When the evidence of Ms. Peters's phone conversations is coupled with Agent Walczyk's testimony, regarding the purchasing habits of drug dealers and users, the evidence supports the jury's finding of criminal intent. *Id.* at 27–28.

Fourth, the Government argues that Mr. Peters presented no evidence that he personally used cocaine. Though the Government acknowledges that the burden of proof rests with the Government, Mr. Peters offered no testimony from any witness to indicate that Mr. Peters used cocaine. *Id.* at 28. In Mr. Peters's summation his counsel argued that the jury find that Mr. Peters had the cocaine for personal use, yet the jury rejected the lesser included offense of simple possession. *Id.* at 29. Where there are multiple possible conclusions, the Government argues that the Court should follow the Second Circuit precedent allowing the jury to resolve the issue,

which it did. *Id.* at 29–30.

In reply, Mr. Peters argues that the Government's evidence is based on mere possession and ambiguous statements made from a pre-paid phone. Reply Memorandum in Support of Defendant's Motions for Judgments of Acquittal and for New Trial, ECF No. 123 ("Reply"), at 2. While Mr. Peters concedes the jury had direct and adequate proof of cocaine possession, the inferential leap to finding an intent to distribute was based on ambiguous statements. *Id.* at 3. Viewing the evidence in the light most favorable to the Government, Mr. Peters argues that there is evidence that Mr. Peters purchased about $700 worth of cocaine, using a pre-paid phone, but there is no evidence of other drug transactions. *Id.* at 4. Although Agent Walczyk testified this was greater than the quantity he typically saw users buy, he also implicitly conceded that a user could consume fourteen grams over the course of several days. *Id.* When coupled with the lack of physical evidence—e.g. packaging materials, customer listings, or call records to customers— Mr. Peters contends that the Government merely has ambiguous statements that require speculation to find intent to distribute. *Id.* at 5–6.

The Court disagrees.

When reviewing a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000). In sum, "[t]he government's case need

not exclude every possible hypothesis of innocence," *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir. 1995) (internal quotation marks omitted), and where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter" *see Guadagna,* 183 F.3d at 129 (internal quotation marks omitted) (alteration in original).

At the same time, the Court is also mindful of its responsibility to protect the Mr. Peters's Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilty beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

Yet viewing the evidence in the light most favorable to the Government, the Government has met its burden in proving that Mr. Peters possessed cocaine with the intent to distribute because a reasonable jury could have found the essential elements of those crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319 (finding that the judgment of acquittal threshold is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." (emphasis in original)).

While Mr. Peters argues that the Court should view each piece of evidence individually, the Court must consider evidence "in its totality, not in isolation, and the Government need not negate every theory of innocence." *Autuori,* 212 F.3d at 114; *United States v. Straus*, 999 F.2d 692, 696 (2d Cir. 1993) (finding that the Court must view all evidence, direct or circumstantial, "not in isolation but in conjunction"). The Court must view the evidence in the light most favorable to the Government and draw all reasonable inferences in the Government's favor. *Id.* And circumstantial evidence—alone—may be sufficient to sustain a conviction. *See United States v. Wexler,* 522 F.3d 194, 206–207 (2d Cir. 2008) (finding that the "sufficiency of the evidence test must consider the Government's case in its totality rather than in its parts, and may be satisfied by circumstantial evidence alone" (citations omitted)).

To convict Mr. Peters of possession with intent to distribute, "the Government was required to prove beyond a reasonable doubt the following elements: (1) the Defendants possessed the controlled substance described in the indictment; (2) the Defendants possessed the controlled substance with the intent to distribute it; and (3) the Defendants did so knowingly and willfully." *United States v. VanHoesen*, 578 F. Supp. 2d 449, 452 (N.D.N.Y. 2008). In this case, Mr. Peters concedes both possession and knowledge, but he challenges the second element of the charge.

"Intent to distribute may be proven by either direct or circumstantial evidence and may be inferred from such things as the possession of a large quantity of a controlled substance." *Id.* (citations omitted). "Proof of such intent need not have been direct." *Heras*, 609 F.3d at 106. The law has long recognized that circumstantial evidence may prove criminal intent alone. *See MacPherson,* 424 F.3d at 189–90 ("The record is devoid of any direct evidence . . . The law,

however, recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."); *United States v. Nelson,* 277 F.3d at 197 ("To begin with, it is well-settled that, as a general matter, criminal intent may be proven by circumstantial evidence."); *United States v. Salameh,* 152 F.3d 88, 143 (2d Cir. 1998) ("[A]s a general rule most evidence of intent is circumstantial.").

In meeting its burden, the Government may prove intent to distribute through expert testimony, *see United States v. Pugliese,* 712 F.2d 1574, 1582 (2d Cir. 1983) (recognizing that an agent's "expert testimony was carefully tailored to facts which were very much at issue in this trial" of whether the drugs were intended for personal use and whether witness testimony was credible"), including evidence of the composition, quantity, quality, and value of the controlled substance. *See id.*

To succeed on the motion for judgment of acquittal, Mr. Peters must demonstrate that "the essential elements of the crime charged could not be found beyond a reasonable doubt by any rational trier of fact." *United States v. McDermott*, 277 F.3d 240, 252 (2d Cir. 2002). But here, there is sufficient evidence for a reasonable jury to conclude that Mr. Peters intended to distribute the cocaine seized upon his April 1, 2016 arrest.

First, Mr. Peters's direct contact with Bobby Gutierrez suggests access to, even if not significant involvement with a much larger drug trafficking operation. Indeed, if Mr. Peters had not contacted Mr. Gutierrez, he would not have been observed by and later arrested by law enforcement, at least on that particular day.

Second, Mr. Peters's two phone calls to Bobby Gutierrez, before he obtained cocaine, also indicated an intent to acquire drugs of a certain quantity. As part of the larger drug trafficking investigation, officers intercepted a phone call from Mr. Peters to Mr. Gutierrez,

which led the monitoring officers to believe that Mr. Peters was arranging a drug sale. During the call Mr. Peters referenced Exit 14, *see* Transcript of Call No. 467, Gov't Ex. 1, which officers understood to mean that a drug sale of fourteen grams would soon occur, *see* Suppression Hearing Transcript, ECF No. 74, at 23:22–24:6. About forty-five minutes later, Mr. Peters called again to arrange a meeting, *see* Transcript of April 1, 2016 Call No. 473, Gov't Ex. 3-T. Consistent with previous intercepts indicating drug trafficking, officers then believed that Mr. Peters would meet Mr. Gutierrez at his place of work to complete the transaction. Suppression Hearing Transcript, ECF No. 74, at 28:6–10.

After his arrest, the Government charged Mr. Peters with possessing fourteen grams of cocaine with the intent to distribute, an amount consistent with the coded language in the phone calls between Mr. Peters and Mr. Gutierrez. *Compare* Transcript of April 1, 2016 Call No. 473, Gov't Ex. 3-T (identifying Exit 14 as a suspected reference to purchasing 14 grams of narcotics) *with* February 20, 2019 Trial Transcript, ECF No. 111, at 301:10–11 (identifying the gross weight of the cocaine sample seized from Mr. Peters as 14.012 grams). Mr. Peters therefore not only knew a suspected drug trafficker of some significance but also had the ability to and did communicate with him in coded language about specific quantities of drugs, quantities later confirmed after his arrest.

Third, Mr. Peters intended to hide the drugs. After Mr. Peters met Mr. Gutierrez, officers followed his car from Bridgeport to Stamford when Officer Velez stopped Mr. Peters's car in front of 38 Home Court in Stamford, Connecticut, where officers identified, and Mr. Peters admitted to having marijuana in the vehicle. Suppression Hearing Transcript, ECF No. 74, at 126:13–24; 127:14–22; 128:14–18. As he approached the car on the driver's side, Officer Velez observed Mr. Peters making movements to hide something between his legs. *Id.* at 127:4–13.

After a drug sniffing K-9 unit assisted, *see id.* at 129:23–130:22; 131:4–7, a search of Mr. Peters's person revealed cocaine wrapped in napkins*, see id.* at 175:7–17; 176:8–11; 176:18–177:16. Thus, Mr. Peters knew how to conceal illegal drugs from easy detection.

Fourth, Mr. Peters's post-arrest phone call to Mr. Gutierrez suggested aborted plans for the now-seized cocaine and concerns for what his arrest might mean for Mr. Gutierrez's drug operation. In that call, Mr. Peters stated that he "didn't even had nothing waiting for [him]," only that he "was just doing that to be ahead of the game for tonight," and that he "wanted to give [Mr. Gutierrez] heads up" that things "looked a little odd, a little crazy." *See* Transcript of April 1, 2016 Call No. 499, Gov't Ex. 8-T. That call also revealed Mr. Peters's ability to identify law enforcement officials possible following him. *Id.* Mr. Peters arguably had a greater familiarity with drug operations and police surveillance than a mere drug user. A jury could therefore reasonably construe his post-arrest comments as part of a plan to distribute cocaine.

Fifth, the expert testimony of Special Agent Walczyk allowed the jury to infer that Mr. Peters's actions suggested involvement in drug selling, and not merely drug usage. Agent Walczyk testified that fourteen grams of cocaine generally would cost between $600 and $700, *see id.* at 363:19–13, "would make 140 dime bags or 70 dubs," *see id.* at 356:25–357:4, and that it would be uncommon for someone to purchase this amount for personal use, *see Id.* at 364:14–25. From Agent Walczyk's experience, a quantity of as little as 3.5 grams of cocaine would be street-level redistribution quantity. *Id.* at 367:17–368:2.

Agent Walczyk also testified that, as an undercover officer, he did not purchase more than one $50 bag of cocaine at a time, and that increments of a tenth of a gram of cocaine were the most common amounts sold to users. *Id.* at 355:14–23. He further testified that mere users only purchase from street-level dealers what they can use immediately, and that these users have

limited resources and could make multiple purchases in a day. *Id.* at 362:17–363:12. He also noted that purchasing a greater amount "would raise suspicion if I was asking for a greater quantity" because "[d]rug consumers generally don't stockpile drugs;" rather, "[t]hey purchase what they're going to use immediately or in the very near future." *Id.* at 355:24–356:7.

In addition, Agent Walczyk also testified that he often comes across pre-paid phones, which "are very commonly used by drug traffickers because it is a cell phone for which fees are paid upfront, that it eliminates the need for providing very specific personal information for a service contract." *Id.* at 350:20–351:2; 351:8–10.

The combined weight of all this evidence is sufficient for a reasonable jury to find that Mr. Peters intended to distribute cocaine beyond a reasonable doubt. The Supreme Court has held that a small quantity of drugs—standing alone—is insufficient to prove intent to distribute. *Turner v. United States*, 396 U.S. 398, 422–23 (1970) (finding 14.68 grams of drugs insufficient to establish intent to distribute on its own). But "any amount of drugs, however, small, will support a conviction where there is additional evidence of intent to distribute." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citation omitted).

Here, Mr. Peters acquired cocaine from suspected drug dealer, knew and used language associated with drug trafficking, understood the likelihood of a police investigation, and utilized a pre-paid phone. When that testimony and taped conversations are coupled with the fourteen grams of cocaine seized from his person, the Government provided evidence of his intent to distribute cocaine. Viewing the audio, testimonial, and expert evidence together, a reasonable jury could determine that Mr. Peters acted with the intent to distribute cocaine. The Court therefore finds that relief under Rule 29 is not warranted.

"A Rule 29 motion should be granted only if the district court concludes there is 'no

evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir. 1972)). The Court must view "the evidence in its totality, . . . and the government need not negate every theory of innocence." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000). Also, the court must "resolve all issues of credibility in favor of the . . . verdict," *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001), and draw all permissible inferences in the government's favor, *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir. 1995). And Mr. Peters "must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty." *Irving*, 452 F.3d at 117.

But Mr. Peters has not met that burden. Rather, he seeks to limit the value of the expert testimony considered by the jury. Although Mr. Peters asks for the Court to discount the expert testimony of Agent Walczyk, "[e]xpert testimony that a quantity of drugs is generally more consistent with distribution than with personal use, if credited, may allow the jury to infer a defendant's intent, but that testimony does not itself opine on the particular defendant's intent." *United States v. Eldridge*, 528 F. App'x 17, 19 (2d Cir. 2013) (summary order).

Moreover, in arguing that additional evidence of intent is missing, Mr. Peters argues that he merely possessed cocaine with no intent to distribute. But he made this argument to the jury, and the jury rejected it.

"[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). The Court must "credit[ ] every inference that the jury might have drawn in favor of the government," *United States v. Temple,* 447 F.3d 130, 136-37 (2d Cir. 2006), and resolve "all

issues of credibility in favor of the jury's verdict." *United States v. Desena,* 260 F.3d 150, 154 (2d Cir. 2001); *see also United States v. Florez,* 447 F.3d 145, 154–55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."). The Court must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Jackson,* 335 F.3d at 180 (internal quotation marks and citation omitted).

Courts must "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *Sanchez,* 969 F.2d at 1414. Courts may "not attempt to second-guess a jury's credibility determination on a sufficiency challenge." *Florez*, 447 F.3d at 156. Only in exceptional circumstances, such as when a witness's testimony is "patently incredible or defies physical realities," may a court reject the testimony "despite the jury's evaluation." *See id.*; *see also United States v. Cote*, 544 F.3d 88, 102 (2d Cir. 2008) (citing *Sanchez* and concluding that "none of the testimony in this case was incredible as a matter of law").

As a result, there is no reason to disturb the jury's verdict. This is not a case where "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna,* 183 F.3d at 130 (internal quotation marks omitted); *see Musacchio v. United States*, 136 S.Ct. 709, 715 (2016) (citing *Burks v. United States*, 437 U.S. 1, 16(1978)) ("Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have been submitted to the jury.'").[5]

Accordingly, when viewing the evidence in the light most favorable to the Government,

---

[5] Significantly, the jury considered the lesser-included offense of simple possession and nevertheless decided that Mr. Peters was guilty of possession with intent to distribute.

the Government has met its burden regarding the criminal intent element in the possession with intent to distribute charge. *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").

## B.      Motion to Vacate and Grant a New Trial

"Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson,* 246 F.3d at 134. When reviewing a motion to vacate and hold a new trial, "the court may grant the motion if the interest of justice so requires." Fed. R. Crim. P. 33(a). In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. When considering a Rule 33 motion, however, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," only intruding in "exceptional circumstances," such as when "testimony is 'patently incredible or defies physical realities.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted). And "the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citing *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). When deciding a Rule 33 motion, courts "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," and be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

Mr. Peters argues that the Court should order a new trial because the inferences made by the jury included impermissible speculation on inconclusive circumstantial evidence. Mem. in Supp. of Post-Trial Mots. at 16. Specifically, the jury heard no evidence that Mr. Peters had customers, had previously purchased fourteen grams of cocaine, made purchases inconsistent with inconsistent use, or that officers found cash, drug paraphernalia, packaging materials, or drug records in Mr. Peters's car or home. *Id.* at 17. Aside from the quantity of drugs, Mr. Peters argues that nothing would tend to show that Mr. Peters intended to distribute drugs. *Id.*

In the absence of evidence to support distribution, Mr. Peters argues that the Government relies on inferential testimony from Agent Walczyk, testimony that did not foreclose the theory that Mr. Peters bought drugs in bulk, ambiguous statements from Mr. Peters's phone calls, and Mr. Peters's use of a pre-paid phone. *Id.* at 17–18. Mr. Peters asserts that the totality of this evidence does not reach beyond a reasonable doubt, and the Government therefore failed to meet its burden. *Id.* at 18–19.

In response, the Government argues that Mr. Peters raises no new arguments for a new trial, aside from insufficiency of the evidence regarding the intent to distribute. Mem. in Opp. to Post-Trial Mots. at 31. But the Second Circuit requires exceptional circumstances and Mr. Peters has not met this standard. *Id.* at 31–32. Because, in the Government's view, none of the evidence presented was patently incredible, nothing in the jury verdict would lead to manifest injustice, and Mr. Peters has not established a need for a new trial. *Id.* at 32.

In reply, Mr. Peters argues that the interest of justice requires a new trial. When considering the facts and circumstances of this case, Mr. Peters argues that the Court should set aside the jury verdict and order a new trial. Reply at 7.

The Court disagrees.

When a defendant challenges a jury's verdict as against the weight of the evidence, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134. "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* In doing so, the Court "must strike a balance between weighing the evidence and credibility of the witnesses and not 'wholly usurp[ing]' the role of the jury." *Id.* at 133 (quoting *Autuori*, 212 F.3d at 120).

As discussed above, when taking the entire case into account, the record evidence supports the jury's conclusion of finding Mr. Peters guilty beyond a reasonable doubt. Mr. Peters received a fair trial, the Court afforded him opportunities to present his defense theories, as well as permitted the jury to consider the lesser included charge of simple possession, and the jury found him guilty on the charge of intent to distribute nevertheless, based on evidence in the record. He has presented no viable basis for the Court to disturb that verdict and grant him a new trial.

Accordingly, the Court denies his motion for a new trial. *See United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008) (requiring "extraordinary circumstances" for the Court to vacate a jury verdict and call for a new trial).

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** both the motion judgment of acquittal and the motion for a new trial.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of August 2019.

       /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE